23876.  GOLDIN *et al. v.* FEDERAL INTERMEDIATE CREDIT BANK.

Decided February 16, 1935. Rehearing denied March 1, 1935.

*E. S. & James Loy Griffith,* for plaintiffs in error.
*Boykin & Boykin,* contra.

Sutton, J.  The plaintiff bank, as transferee, instituted pro-

ceedings against the defendants to foreclose a bill of sale executed by the defendants to secure a debt. The instrument recited that it conveyed title to certain crops, including cotton, to be grown upon described lands within 12 months from the date thereof, and was executed pursuant to the act of August 22, 1925. Ga. L. 1925, p. 118; Michie's Code (1926), § 3310 (1). The defendants interposed their affidavit of illegality, in which they set up that the indebtedness secured by the bill of sale had been paid; that when the debt matured, they sent, at the special instance, direction, and command of a duly authorized agent of the plaintiff, thirty bales of cotton grown by them on said lands to the Georgia Cotton Growers Association, where the cotton was to be sold and the proceeds paid over to the plaintiff, and if there were proceeds left over, the defendants were to receive the same. Defendants set up therein that at this time they were offered a price for the cotton that would have more than paid off said secured debt, and they requested this agent of the plaintiff to allow them to sell the cotton to such buyer, but he refused so to do, stating that his principal had a lien on it, that it belonged to his principal, and that the defendants would have to ship the cotton to said association, and that the plaintiff claimed the right, under the bill of sale, to control and dispose of the cotton, and that it exercised this authority by requiring the defendants to turn the cotton over to the cotton association, to sell and apply the proceeds on its note. Defendants further set up that by reason of the foregoing facts, they do not owe the plaintiff anything, the cotton being worth more than the secured debt at the time it was turned over to the plaintiff's agent and shipped to the cotton association. The undisputed evidence shows that the agent of the plaintiff, handling the collection of the indebtedness due it by them, wrote to the defendants and stated that they had to "ship their cotton"; that the defendants gathered thirty bales of cotton to pay off this indebtedness, and called on the plaintiff's agent, in response to the letter, and informed him that they were ready to pay off the indebtedness, and he notified the defendants that the cotton belonged to the plaintiff by virtue of the contract and that the defendants would have to ship the cotton to the Georgia Cotton Growers Association in Atlanta, to be pooled, along with other cotton; that the defendants did not want to do this, but wanted to sell the cotton and pay off such indebtedness;

that this agent, who had the bill of sale and note in his possession, told the defendants that they could not do this, but that the plaintiff requested that they ship the cotton to the association; that the defendants were offered a price of 22½ cents per pound for the cotton, which weighed 14,902 pounds, and they so informed the plantiff's agent·and asked that they be allowed to sell the cotton for this sum, but he informed the defendants that the plaintiff had a mortgage on the cotton and that it would have to be shipped to the association, but he would guarantee that when sold by the association it would bring more than enough to pay the debt; that the cotton was then turned over to the association's agent and the plaintiff's agent and tagged with association tickets or tags produced by the plaintiff's agent, and shipped to the association. The application for membership in the cotton association, in the record, was signed by but one of the defendants, and this was on the same day the cotton was shipped. The bill of sale gave authority for the plaintiff to take possession of the cotton on maturity of the debt, and "sell the same as the agent of the" defendants "in the open market in the usual way at private sale." It was contended by the defendants that they had nothing further to do with the cotton when they brought it to the railroad station, but that they turned it over to the plaintiff's agent to be shipped to the association. The contract with the association provided that the cotton was to be sold with other cotton pooled, at the best price obtainable under market conditions, and the proceeds, after payment to the association of its charges and expenses of sale, were to be paid to the plaintiff, and if there was more than enough to pay the note it was to be paid to the defendants. The plaintiff introduced no evidence as to the sale of the cotton, that is, whether part or all of it had been sold, and at what price it was sold for, or the total amount derived therefrom and the disposition thereof. The original amount of the note was $3,200, and two credits appear thereon, one for $1490.20 and the other for $96.21. The only evidence in the record as to the credits or the sale of the cotton is from one of the defendants, as follows: "I do not know where the credit that is on this paper came from. I never did make any other payment in any way, except this cotton on this paper. Of course, I know it come from this cotton." The undisputed evidence shows that there were 14,902 pounds of this cotton,

and that it was worth 22½ cents a pound, according to the prevailing market price of the cotton at the time and place that the defendants were required by plaintiff to ship the same to the association. The record is silent as to whether the price of cotton went up or down after the defendants parted with possession and control of the cotton. It will be seen that the value of the said cotton at that time was $3,352.95, and that the two credits on the note amount to only $2454.41, there being a difference in these two amounts of $898.54. At the conclusion of the evidence, the trial judge directed a verdict for the plaintiff, that is that the fi. fa. proceed, the mortgage execution being for $745.59 principal, $113.79 interest, and $85.93 attorneys' fees. The defendants moved for a new trial, the motion was overruled, and they excepted.

1. Where a bill of sale is given to secure a debt, and on maturity of the debt the creditor elects to exercise the right given therein to take possession of the security and to sell it at private sale as the agent of the debtor, the creditor is acting as agent for the debtor in thus dealing with the security, and must exercise ordinary diligence, "such as persons of common prudence use in relation to their own affairs," in handling such security, having due regard to the rights of the debtor therein. Code of 1933, § 4-203; *Brown* v. *Clayton,* 12 *Ga.* 564 (4); *Pressley* v. *McLanahan,* 14 *Ga. App.* 366, 368 (80 S. E. 902).

2. In a suit by the creditor against the debtor to recover the balance of the debt, where the creditor has taken possession of, and assumed dominion over, the property, under the right given in the bill of sale, the evidence will not authorize a recovery for the creditor in any amount until the creditor has carried the burden of showing a disposition of the property as agent of the debtor under the terms of the contract, and the amount realized by the creditor on such disposition. The amount of the recovery will then be limited to the difference between the debt and the amount realized from such disposition, provided the latter is less than the former. *Hargett* v. *Muscogee Bank,* 32 *Ga. App.* 701 (124 S. E. 541).

3. The foregoing principles are applicable where the creditor refuses to permit the debtor to dispose of the security and pay off the indebtedness, but, in exercising control over the security under the authority given in the bill of sale, does not sell the property it-

self, but requires the debtor to turn the security, consisting of 30 bales of cotton, over to a third person to be sold at the best price obtainable under the market conditions, the proceeds of the sale to be applied to payment of the indebtedness, and the balance, if any, to be turned over to the debtor, and where thereafter the creditor brings an action to recover a claimed balance due on the indebtedness, and it does not appear that when the cotton was sold by the third person, the best price obtainable under market conditions was had for it, how much the cotton was sold for, or how much of it was sold, and what disposition had been made of the proceeds; nor whether ordinary diligence had been exercised in the disposition of the same.

4. A recovery for attorney's fees was not permissible, although the note or other instrument may provide for the payment thereof, where there was no prescribed notice of intention given to the defendant makers by the holder that the holder was going to bring suit on the instrument and would claim such attorney's fees unless the obligation was paid on or before the return day of the court to which suit would be filed. Civil Code (1910), § 4252; *Turner* v. *Peacock,* 153 *Ga.* 870 (113 S. E. 585).

5. Applying the above rulings to the evidence in this case, the trial judge erred in directing a verdict for the plaintiff and in overruling the defendant's motion for new trial.

*Judgment reversed. Stephens, J., concurs. Jenkins, P. J., dissents.*

JENKINS, P. J. dissenting. I have not been able to concur in the decision of the majority of the court as to the effect of the evidence and the law applicable thereto. Although the instrument given by the defendants to the creditor is designated both as a mortgage and as a bill of sale, it is my opinion that it operated to pass title to the described property both by virtue of the express language of the instrument and by its reference to the Code of 1910, § 3306 (Code of 1933, § 67-1301). It is also true that the instrument gave to the creditor the right, after default, to take possession of the property and sell it "as the agent of [the defendants] in the open market in the usual way at private sale, or at public sale." The rulings made in the majority opinion are apparently based on the theory that the rights given in the bill of sale were exercised by the creditor, and that it took sole possession, custody, and control

over the property, with the consequent duty to account in detail to the defendants for the proceeds thereof; and that, having failed and refused on request of the defendants to sell the property at the time it was placed in its sole possession, custody, and control, it is accountable to them for the current market price on the date of its refusal. As I see it, the record does not bear out any such assumption. I do not understand that the right given by the bill of sale was ever exercised by the creditor, but on the contrary, on the day before the debt became due, the defendants entered into a written contract with the Georgia Cotton Growers Co-operative Association, whereby the defendants in terms agreed that the cotton "be pooled for my account." To the defendants' signed application for membership in the association was attached a marketing agreement, providing that the pool of the cotton should "be for the full season," and that the association should sell the cotton "at the best prices obtainable by it under market conditions," and pay over "the net income received therefrom (less freight, insurance and interest)" to the growers named in the contract, "after deducting therefrom, within the discretion of the association, the cost of handling, grading, and marketing such cotton," etc. Attached to this market agreement by the defendants was a paper signed by the creditor as lienholder, agreeing to such pooling, and providing that the net proceeds from sales be remitted directly to it as mortgagee to the extent of its claim. While the defendants' affidavit of illegality sets forth that the creditor "persuaded and advised" them to pool the cotton with the Cotton Growers Association, there was no pleading or evidence to the effect that any fraud or duress was practiced on the defendants in connection with the pooling agreement made by them with the association or the delivery of the cotton to the association in furtherance of the terms of the pooling agreement. It would seem to be clear that the mere fact that the bill of sale gave to the creditor the right, after maturity of the debt, to seize and sell the crop of cotton in the manner provided by the instrument as a method of collecting its indebtedness did not give to the creditor any sort of right, power, or authority to pool the cotton, or compel the defendants to do so, with a third person with discretion vested in such third person as to the time and manner of sale. The creditor having no right or power under the bill of sale to compel the defendants to pool the cotton with the

association, their doing so must be taken as their own voluntary act, irrespective of any persuasion or advice given by the creditor, in the absence of fraud or duress. Accordingly, under the undisputed oral testimony and writings in evidence, the Cotton Association must be accounted as the agent of the defendants by whom the cotton was pooled, and to a limited extent as also the agent of both the defendants and the creditor in that the association was required to remit directly to the creditor the net proceeds received from cotton sales by the association up to the amount of the lien.

The pooling of the cotton by the defendants must necessarily be taken as their own voluntary act, not only for the reason just stated, that the creditor had no right or power to compel any such action on the part of the defendants, but for the additional reason that, according to the affidavit of illegality, at the time the cotton was pooled with and surrendered to the association by the defendants, its value was more than enough to pay off and discharge the obligation owing by the defendants to the creditor. This being true, the defendants, if they cared to sell the cotton and discharge the creditor's debt, were authorized to do so without infringing any right of the creditor or any rule of law. The penal prohibition which prevents the wrongful sale of property under a lien applies only where such a sale is made "with intent to defraud" and where "loss shall thereby be sustained by the holder" of the lien. Penal Code (1910), § 720 (Code of 1933, § 67-9901). A mere tender by the defendants or by the purchaser of the property of the amount due to the creditor would have discharged its lien, even if for any unaccountable reason it had refused to accept payment in full of its claim. *Bourquin* v. *Bourquin,* 120 *Ga.* 115 (7, *b*), 119, 120 (47 S. E. 639) ; *McCalla* v. *Clark,* 55 *Ga.* 53. It therefore seems that the act of the defendants in pooling the property with the Cotton Association was altogether voluntary, and that the creditor was not in a position to exercise and could not have exercised any sort of power in requiring the action which was in fact taken by the defendants themselves. In pooling the cotton as they did, they voluntarily took the chance of the price going up or down. If it had gone up, they would have been the gainers. The creditor had nothing to gain by the price going up. If it had gone down, however (as it did), the security of the creditor might have been impaired. It thus appears that the defendants, and not the creditor,

were the ones who might have gained by the pooling transaction.

Reference is made in the majority opinion to the fact that the agreement with the association was signed by only one of the two defendants. While this is true, the defendant signing the agreement papers, who was the mother of the other defendant, was the owner of the lands on which the cotton was grown, according to the recital in the bill of sale signed by both of the defendants. No question was raised as to the participation of the son in all of the transactions, including the pooling and delivery of the cotton to the association under the signed agreement of the mother. The son himself testified, "My brother and myself delivered the cotton. . . When we delivered it, we sent them [the Cotton Growers Association] the bill of lading and also this paper signed November 11, 1925, by Mrs. S. S. Goldin," the mother.

As I see the case, under no conceivable theory were the defendants entitled to prevail. If it were to be assumed, contrary to the undisputed facts set forth in the record, that the property was actually in the hands, custody, and sole control of the creditor, even then and in that event, under the decisions in this State the statements made in the counter-affidavit and the testimony as to the defendants' alleged request to sell the cotton would not entitle them to recover damages because of a refusal of their request, and would not constitute a legal defense to an action for the indebtedness, even though there was a subsequent depreciation in the value of the property. In *First National Bank of Blakely* v. *Hallaway,* 172 *Ga.* 731 (158 S. E. 565, 77 A. L. R. 375), the Supreme Court held: "One who receives collateral security is bound to the use of reasonable diligence in connection therewith. If the collateral be promissory notes or like evidences of debt, he is bound to use ordinary diligence to collect them. But when chattels, personal property, such as cotton, was deposited as collateral security, the creditor was not compelled, on failure of the debtor to pay the debt, to sell the collateral, although he had the option to do so, in the manner provided by the Code, § 3530. His not selling, although the pledgor demanded that he sell the same and there was a subsequent depreciation of the value of the cotton, constituted no defense to the action on the indebtedness." The court followed and in the opinion quoted from the earlier decisions of *Colquitt* v. *Stullz,* 65 *Ga.* 305, and *Napier* v. *Central Georgia Bank,* 68 *Ga.* 637 (2).

Thus, even if, under the evidence, it could be inferred, as the majority of the court holds, that the creditor took "possession of and assumed dominion over the property under the right given it in the bill of sale," there would have arisen no consequent obligation to sell the cotton security upon the request of the defendants, such as would create a liability for any such refusal. Upon the theory of possession by the creditor, the case would be controlled by the above decisions, and the defendants would not have been entitled to prevail.

With regard to the burden of proof, in showing how much cotton had been sold by the association, the prices paid, accounting for the proceeds, and showing the nature of the credits, I can not agree that this burden rested on the plaintiff, that it failed to carry the burden, and that the verdict was therefore without evidence to support it. The plaintiff pleaded and introduced the $3200 note, showing on its face credit entries of $1490.20 and $964.21, and showing that the balance due was the $745.59 principal sued for. There was no defense filed and no evidence that there had been any total or partial payments different from those pleaded and shown on the note, either by way of money or proceeds from the cotton. The sole defense pleaded was that the defendants owed nothing because the plaintiff had not agreed to a sale of the cotton on the day before it was pooled, when the price would have paid off the debt, and that the plaintiff itself took charge of the cotton, pooled it, and collected the proceeds. This is quite different from a plea of total or partial payment, or a plea contesting the correctness of the alleged credits. The right of the creditor, under the defendants' own pooling agreement, was limited to the right to receive directly such "net proceeds" as the association might remit from sales of the cotton, over which the creditor retained no control. Its only duty to the defendants was to credit on the note the "net proceeds" received from the association as the agent of both parties. Prima facie, when the note was admitted in evidence with the credit entries thereon, these amounts were correct, unless questioned by pleading or at least controverting evidence from the defendants. There was no such pleading or evidence. The defendant son testified as to these credits, "I never did make any other payments in any other way except this cotton on this paper," and "Of course I know [the credits] came from this cotton." All the credits thus admittedly

coming from sales of the cotton by the association, and the correctness of the·credit entries as representing the "net proceeds" actually received by the plaintiff creditor being in no wise questioned, the trial judge properly directed a verdict in favor of the plaintiff and properly refused a new trial, except as to attorney's fees. There being no notice to the defendants so as to authorize their recovery, in my opinion the judgment should be affirmed upon condition that this erroneous item be written off.

ON MOTION FOR REHEARING.

SUTTON, J. It is contended by plaintiff in its motion for rehearing that the following quotations from the statement of facts in the opinion of the court are not authorized by the evidence and record in this case: "Plaintiff requested that they ship this cotton to the association." "He [Sims] informed the defendants that the plaintiff had a mortgage on the cotton and that it would have to be shipped to the association;" "that the cotton was then turned over to the association's agent and the plaintiff's agent and tagged with association tickets or tags, . . and shipped to the association." "At the time and place the defendants were requested by plaintiff to ship it to the association."

The foreclosure proceeding was brought in the name of the Federal Intermediate Credit Bank against Mrs. S. S. Goldin and G. C. Goldin, on the note and bill of sale, indorsed "Pay to Federal Intermediate Credit Bank, Columbia, S. C., Carroll Agr. Credit Corp., by L. S. Sims."

Defendants, among other things, set up in their affidavit of illegality that L. S. Sims was the agent of and acted for the plaintiff, Intermediate Credit Bank, in the negotiations and transactions with defendants with reference to the cotton in question; and that the cotton was the property of the Intermediate Credit Bank and was shipped for the use and benefit of the plaintiff in accordance with the directions of said Sims.

G. C. Goldin and J. W. Goldin were the only witnesses who testified in the case, and their testimony is undisputed. G. C. Goldin testified in part: "We did go to Carrollton to see Mr. Sims after he wrote this letter. When we got there I told him we was ready to pay the indebtedness off, and he told us we had to ship our cotton to the cotton-growers association, . . that it was requested. . . He had the papers in his hands when I went down there and

I told him we didn't want it to go in the cotton-growers association. He said it was requested that we do that. . . My brother, J. W. Goldin, was with me. He told us that we had to ship the cotton to the cotton-growers association, and he would guarantee it to take care of the indebtedness, the notes. That was just a day or two before the note became due." J. W. Goldin testified in part: "I did go with Cleve (G. C. Goldin) to Carrollton to see Mr. Sims about this debt that is foreclosed here. Sims had the note. What was said between me and Cleve and Sims in that conversation? We had the cotton on the platform at Temple, and W. L. Stedman wanted to buy this cotton, . . he told me he would give 22-1/2 cents a pound for it, and I told Sims that it would overpay this obligation to his bank down there, and he says, 'You can't sell it, we have a mortgage on it, and we will have to ship it to the cotton-growers association in Atlanta.' Now after that was done, they shipped the cotton to the cotton-growers association; they wouldn't release it, and it was shipped to the association. They sent tags for Mr. Manley and Mr. Allgood, the field man, to tag the cotton. Sims sent the tags. . . They are the ones I say Sims sent up there. Sims had the note at that time. . . He [Sims] said we had to pool our cotton. He says, 'If you will give the bank over there whatever it is, they do the collecting for the association.' . . He said it was his cotton and he was going to ship it to the cotton-growers association, he had a mortgage on it. . . He said he was collecting for the Intermediate Credit Bank of Columbia. This paper I saw was in his possession."

We were, and still are, of the opinion, that the record and evidence authorized the inference and conclusion that S. L. Sims was acting for the plaintiff, Intermediate Credit Bank, in his transactions with the defendants concerning the cotton in question, and that the statement of facts in the above opinion, to which the plaintiff takes exception in the motion for rehearing, is authorized by the evidence and the record in this case. The motion for rehearing is                           *Denied. Stephens, J., concurs.*

JENKINS, P. J. I concur in what is said by the court on the motion for rehearing, but adhere to my dissent in the case.